The next case, No. 23-1543, Pamela Ferreira v. Merrick v. Garland. At this time, would Counsel for the Petitioner please introduce himself on the record to begin? Good morning, Your Honors. I may please the Court, saying I came for the Petitioner. Chief Judge Barron, may I reserve one minute for rebuttal? You may. Thank you. So in this case, there are two withholding claims, gender-based and family-based. Let me start with gender-based claim. So there are two reasons why this Court should vacate the agency's denial. The first one is the Do you mind if you started with the other one first, the family-based? Yes, Your Honor. So this positive question for the family is the nexus. And I think the parties disagree on the scope of the nexus. And the agency as well. So the agency's decision really focuses on the persecutor's intent. And the government's concession is the agency did not apply the Mixed Motives Standard. And the agency did not have to consider the concession is a failure to the government's argument. If we look at the statute and regulation, the focus is on why the person suffered the persecution or why the person would suffer the persecution. The focus is on the asylum seeker or withholding applicant. So what this means in practice and the evaluation evidence is persecutor's intent is important. The persecutor's, the societal significance of that action, whether the persecutor used exploited the means to protect the ground as a significant means to just suffer. There is a finding here by the IJ and it's affirmed by the BIA that this was one, it was a criminal act, it was independent, it was based on this individual's abuse of behavior in this particular instance, but not for a protected reason. I understand, Your Honor. But how can we review that? Because again, that's a factual finding. I understand, Your Honor. But I think the problem here is the legal error. So I think the agency did not really understand properly about the nexus inquiry. So the presence of the persecutor's intent of having the sexual desire does not otherwise undermine, negate the presence of the reason why the person suffered the harm. So for example, petitioner testified when the petitioner first became the victim of the sexual violence, petitioner did not want to comply with that order, the command. But then persecutor said, if you don't do it, I would kill your mother. So that, the family, the relationship comes in. And that's also being corroborated by... The reason that the child was being selected was because of her family status. That's because if, for example, if the petitioner did not get the threatening based on the family relationship, then she would not have complied with the command. And at a minimum, if the agent, if the court has some concern about whether the record compels that conclusion, I think the more fundamental problem is the failure to apply the proper nexus standard. So agent... Counsel, I'm sorry. I'm not understanding that argument. I thought the PSG is that the persecutor is targeting her because she's a member of his family. So how does the threat against the... And tell me if I'm wrong, but that's how I understood your argument. How does the threat against her mother support that claim? Am I misunderstanding your claim? Your family-based claim? Yes and no. Okay. So why yes? So yes, it's important to look at the claim as the persecutor is targeting someone based on protected ground. But the fundamental question is why the person became the victim. So again, this is the difference between the persecutor's perspective versus victim's perspective. I completely understand that. I understand that argument. I guess I'm asking you an earlier question. Isn't the PSG, the family-based PSG here, that he targeted her because she's a member of his family? Am I wrong about that? The records are unclear as to what precisely the meaning of the family relationship, but based on my best interpretation of the argument below with the record, I think her claim was just because of the family relationship. And her family relationship, which included her uncle, the persecutor as well. So the claim was not that, for example, the uncle persecuted, he was persecuted because of her membership of her mother's family relationship. Right. It's that she's his niece. Yes. Okay. So let me go back to this fundamental issue of the scope of the nexus. What we are trying to show is now we're not focused on the motivation of the persecutor, but we're just focused on on what account was she subject to the persecution. Yes, that's correct. And that argument was not made to the IJ, correct? That argument, I think it did. I think it did make an argument. I think it was more a general argument for the IJ. But I think our argument is, at a minimum, number one, I think it was a made argument to the IJ. Where in the papers filed to the IJ was that argument presented? We can refer to that in the rebuttal time. But even assuming that the argument was not made. Well, if it wasn't made, then it's first made to the BIA. The BIA then just affirms the factual findings at pages five and six of the IJ's decision. If the IJ in rejecting it just rejects motive-based arguments because that's all was made, how could we say the that's made for the first time to the BIA? I think this court, so when the argument is being raised before the BIA in the first instance of specific this claim, I think the BIA has two choices. One is to say that you didn't raise this argument below, so we are not addressing this claim. Number two is you're raising this claim, but because the IJ did not make a fact-finding, we are remanding the case to the agency. That's permissible because the BIA is the supervisory agency that has a supervisory role of the agency. But none of that happened. So even if the court finds that this argument was not made below And unfortunately, the argument you're now making to us wasn't made to us. I understand that, but the government does not. We made an argument that the failure, the BIA made an error and Yeah, but the error you're making is just that it didn't address this point. Now, what I'm saying is the IJ was never told to address the point. The BIA then says the IJ got it right. You then say to us, well, that's an error, without addressing what the error was, which you're now saying is this new thing, which is it was an error for it not to address whether it should have remanded or instead found the reason we did it is because you didn't raise it to us. That's not something that we can address for the first time in an oral argument. The first response is, Your Honor, the first response, I don't think this court's case law has construed that exhaustion requirement that strictly. I think it was fairly enough for the petitioner to make that argument of the legal error of the nexus. And I think that should be sufficient for the, in terms of the exhaustion issue. Second response is the government has not claimed a response, challenged that exhaustion. So under Santos-Sacaria, I don't think that argument is weighed. So I think this court can address the claim. Counsel, can I just take you back to a more basic point? I read all of the testimony of your client before the IJ, and there's just nothing in her testimony where she says that she thinks she was targeted because she was his niece. There's really nothing about that. So I think the point the government is making is there was no need to do a mixed motive analysis because there was no mixed motive presented to the IJ, and therefore the IJ couldn't possibly have gotten this wrong. So can you just address, again, based on the record, is there anything in the record showing that she was targeted because she was his niece? So I'm still assuming that you're talking about the actual motive, because we also made an argument independent from the actual motive that said the nexus can be also satisfied with, for example, other evidence. I completely understand that. So you're saying the country conditions suggest that, but I'm just saying in terms of her testimony, is there anything in her testimony that you can point to? Have I missed anything? I think in my view, for example, the fact that the uncle used the family as a relation to threatening tool as a means to get her compliance with that sexual rape, in my view, I think that's enough to show. I think the court can make an inference of that as the uncle was motivated, at a minimum motivated, based on the family relation. Anything other than that? And the country conditions. But the country conditions evidence, you also say with respect to the non-motive, non-perpetrator motive, perpetrator motive based contention. If I'm following it, in your brief to us, you point to her testimony that says one of the reasons she didn't complain about what was happening to her was because she was both ashamed and afraid to say that a family member was doing it. That's correct. Which I take as part of your, for lack of a better word, unable and unwilling, based on account of reason for concluding that the nexus is satisfied. That's correct. And just so I get the logic of that, that would be something like if you had evidence in the record of I'm constantly being threatened with death, if I can show they're unable and unwilling to do anything about it, my only flaw in that argument is I don't show that it's on account of a protected ground. But if I can show, although they protect everybody from murder, they don't protect my ethnic group from murder, then your argument would be even though the people are threatening you with murder for reasons unrelated to your protected ground, you can still show that the persecution was on account of a protected ground because it's only happening repeatedly because of your protected ground, because the government won't do anything for it for that reason. That's the idea? That's correct. Okay. And then, but that aspect of the argument is, if you want to address the rebuttal, I don't see that in the contention to the IJ. Again, I understand that argument was not raised for the IJ. Okay. And if it wasn't made, again, I go back to what I stated that the IJ basically determined he just committed a vicious criminal act, targeted. She was at the wrong place at the wrong time, but this was a criminal act. This was not because of any other reason, so doesn't that, again, carry this positive weight? But again, Your Honor, I'm just going to just re-summarize the point that I just made. If the BI had a problem of the fact that the argument was not raised before the IJ, again, BI had the wide latitude, it has broad power to address main claims, then BI could have said so. The problem of this case is that BI does not actually opine on anything about that point. So we actually do not know what the BI thought. BI actually thought about that question. So I think even if— If the BIA isn't the standard, if the BIA doesn't touch something, then we look to what the IJ said. Sure, sure. But if the BIA, if the court doesn't have the BI's position with respect to that point, I think the proper course of adjudication is to send the case back to the BI to re-address that claim. But we have a record below, and we have a credibility of whether the evidence finding by the IJ isn't that sufficient. I understand the efficiency, and that could have been the case if this case were just ordinary civil litigation. But this case is a administrative case, and this court's case law and the Supreme Court's case law is clear under Schenery. And all this court's precedent, that this court's review is limited to the ground invoked by the agency. And I do not see any of the agencies, the ground invoked, especially with respect to that point and Chief Judge Barron's point. So we ask the court to send the case back to the BIA. Can you turn to the gender-based PSG? Yes, Your Honor. So there are two reasons why this court should vacate the gender-based denial. The first one is the BIA's rejection of a group that was different from the one raised below. The government argues that BIA probably understood the proposed social group. However, when we look at the conclusion and analysis of the BIA's denier, it was only limited to the past victims of domestic violence who opposed. What do we do with the fact that in the petitioner's brief to the BIA, they described the group as past survivors of domestic violence? So I don't think— I do not think there's a problem because petitioner's brief did not limit its analysis to the past victims alone, period. But it's a little bit hard—I mean, I don't mean to criticize the brief writer, but reading that brief, it's not entirely clear to me whether that brief is saying, this is what we're describing it as, or here's another version of it that's distinct from the one that we described below. So it just seems to me that it's a little hard to see how the BIA did anything that was unreasonable in following the account in the BIA—in the brief to the BIA, which described it as domestic survivors, unless there's something I'm missing. I understand, Your Honor. And I understand Your Honor's concern, but if it was reasonable for the BIA to just rely on the past victims, when within the same sentence, within the same paragraph, the petitioner also made a point about treated women. And so that goes to the second point. The agency's denial, categorical rejection of the remand request for the consideration of treated women, I think is also unreasonable. That's because the BIA relies on matter of WIC, and also the point that this argument was not preserved. But another is correct, because matter of WIC does not provide the absolute power to the BIA to reject all modified PSG. The threshold question is whether the modified social group is substantially different in terms of the linguistic issue and the logic issue. And when we look at the pre-hearing brief before the IJ, the petitioner submitted, if I just ignore the labeling of it, the entire paragraph, two paragraphs, were about treated women. And on top of that, there was intervening precedent coming from this court about that. Wouldn't the nexus analysis be rather different if the group were redefined as women? So in terms of the BIA's nexus analysis, Your Honor? Anybody's nexus analysis. In other words, if we re-describe the group now as all women, the nexus that would have to be shown would be rather different than the nexus that you were trying to show. It could. And it would, if I'm following, the idea would be any instance of child abuse of a minor child who is of female gender would be on account of that person being a woman, which seems like a rather different claim than the claim that the more narrow one that was being made in light of how the PSG was being described. So that might support the idea that they're not substantially similar for these purposes. Yes. For nexus purposes, in theory, it's quite possible, which is why petitioner made a remand request. Petitioner did not ask the BIA to address the treated women social group at the appended stage, which is why petitioner— So what I'm saying is precisely because it would be so different on remand as to nexus, doesn't that seem to support the BIA's determination that there was no need for a remand because the group isn't substantially similar? I don't think the BIA should opine on that point because BIA only made one sentence. I understand that it's one theory. It's possible that that could be something that BIA can invoke. But I don't see that, any of the indications reflecting such view of the BIA. I see that my time is over. Unless the court has any questions, I can address other claims in reported time. Thank you. Thank you, counsel. At this time, if counsel for the respondent would please introduce himself on the record. Joseph O'Connell, again, on behalf of the Attorney General. I'll address the family nexus first. So in terms of the family PSG, it's just a basic motive issue. Ms. Ferreira didn't show that the uncle abused her in the 1970s because she was a member of any particular family. He obviously abused her to satiate his own criminal sexual desires. And while the family living situation might have provided the uncle with the opportunity to do so, it wasn't the reason he did so. In their testimony, Ms. Ferreira testified that the uncle told her not to leave because he's having a good time. That doesn't reflect any animus against the family. As Petitioner's counsel brought up, he said he was going to kill the mother. That's really just a means to an end in achieving his, again, criminal sexual desires. There was also an attempted robbery in 2018, but Ms. Ferreira admitted that the uncle targeted her mother because he thought she had money. Once again, there's no evidence that the uncle had any animus against Ms. Ferreira's family. When the uncle discovered that Ms. Ferreira's mother didn't have any money, he let her go without harming her. And so because Ms. Ferreira did not show a nexus to the past persecution, she wasn't entitled to a rebuttable presumption of future persecution. And Ms. Ferreira admitted that she couldn't think of any reason as to why the uncle would target her or be interested in her at all, all these years later. And in fact, the uncle would be in his late 70s at this point. Can I just ask you, does it matter in the government's view whether we conceive of the family status here as being the victim having the status of being of the same family as the perpetrator, or rather it's enough if she was targeted because she was a member of a family? I don't think the petitioner clearly delineated which family that she was talking about when she talked about family animus. So if we thought it was enough that she be a member of a family and that she was being targeted for that reason, why isn't the evidence of the threat to her mother being just a means to an end to achieve his actual motivation, which was the criminal sexual desires? Again, that was just a way to go about doing what he's trying to do. Again, the actual motivation is the factual determination and the agency made the factual finding that there was no nexus to the family. The motive here is the criminal sexual desires. And as heinous as the acts are, it's basically just a fake. But I mean, what's different than him saying, I'm targeting you because I have access to your mother and I can threaten her. That's why I'm picking this child because of her relationship to her mother. That's the means to an end portion of it. Do we have precedent that makes clear that that's not enough to show that it was on account of her family status? Perspectively, it's not enough to show that those incidental or tangential reasons are, again, just the means to an end to get to where he wants to go, which is the actual motivation. Again, if that actual underlying motivation wasn't there, then he wouldn't be targeting the mother at all. So that would fall away if there wasn't the underlying motivation of the criminal sexual desire. And so because there is no nexus to family, there is no reason to get into the one central reason standard of the mixed motive. Again, the one central reason is the mixed motive standard. And it only comes into play when there are more than one motive. And here, the agency made the finding, the factual finding, that there was no nexus to the family, whatever that family might be. The motivation was the criminal sexual desire. And so there's no reason to get into these other questions regarding the one central reason. Withholding of removal doesn't apply. Of course, we addressed that in our brief. And we relied on a matter of CTL to say that the one central reason applies to the withholding removal. But I'd be happy to get into that, too, if you'd like to discuss it. Let me ask you, under the one central reason analysis, your position is that petitioner's claims still would fail? I'm sorry, sir? Under the one central reason analysis, petitioner's, in the government's view, the petitioner's view would still fail? Yes. Well, we would argue that, yes. We would argue that because there is only one motive. And that goes back to the nexus. Yeah, it goes back to the nexus. It's this factual finding right in the nexus. And so even under the one central reason, it wouldn't apply. Where you have one motive, all you have to do is take that motive and apply it to the five protected grounds and see if it matches up. Where you have two motives, competing motives, multiple motives, you have to take the one that matches up to the protected ground, and you have to see if that is one central reason for the harm. One of my questions to opposing counsel, I asked a similar question. He said that this was not really discussed, the nexus, at the BIA level. So we should remand. What do we have to say about that? As I understand it, the board did everything that was required of it in terms of affirming the IJ's nexus factual finding. And because of that, the board's affirmance of the IJ's factual finding regarding criminal sexual desire, that's enough to take care of everything. It was covered by the board, it was covered by the IJ. Right, right. So that would take care of all of it. What about in terms of the gender-based group? Why was a remand not appropriate there? Well, because it wasn't raised to the immigration court. This is sort of the perfect example of... Because what wasn't raised? The general PSG? Trinidadian women, generally, was not raised. So there was a gender aspect to the articulated PSG. It's kind of a mouthful. It's Trinidadian women who oppose Trinidad social norms in that they do not want to be subjected to abuse, harassment, violence, sexual abuse by family members, significantly others based on their gender. So before the board, Ms. Ferrer attempted to change her PSG, but the board basically abused the long-standing rule of exhaustion. And this is especially important in this context because these PSG cases are very fact-intensive. And the IJ has to make a number of factual findings in the first instance, the board can't do. Now, I understand that she's claiming that there's no difference between the groups she articulated... Well, not no difference, no substantial difference. Do you agree that's the standard? I agree that that's what Matter of WYC says, but I think there's a significant difference. And I would point to the fact that her articulated PSG is based on opposition to social norms. And that language has to have some relevant effect. In denying the remand, the BIA cited to... WYC. So your idea is that we should understand this as having applied WYC standard? Yes. But that's, again, that's just a basic exhaustion requirement. And that goes to the burden of proof. And there's other board cases that say that you have to articulate your particular social group in the first instance, because it's so important in this context. Because these are factual findings that have to be made in the first instance. This also is in a case like Espinoza-Ochoa, where the applicant accidentally added the phrase, who had been persecuted there was obviously their landowner PSG. And the agency's decision in that case was much more of a reflex or a reaction, as opposed to a reasoned decision based on the facts, which is what happened here. In fact, Petitioner's Council submitted the agency decisions to Espinoza. And they're very different than... I would invite the court to read those decisions, too, because they're very different. In Depenia, we remanded for consideration of it. Now, if I remember, we didn't do that solely on that ground. We were remanding anyway. And then we just simply said in... We just said that since we were remanding this, that could be considered. Is that right? Or am I misunderstanding? That's right. So Depenia is interesting because in that case, the board erred because it read matter of AB to require the per se circularity finding. And so that's not what happened here. There was a circularity finding, but the circularity finding was based on the record evidence. So here the claim is that the error was not remanding, and we didn't pass on that in Depenia. Is that right? Well, in Depenia, no. The error in Depenia was a circularity finding. So in Depenia, you didn't pass on whether not remanding for women would have been an error. It just left open that question. But I think an important point in Depenia is that the court declined to even make a dispositive finding about Dominican women generally because the petitioner in Depenia did not raise that claim to the immigration court in the first instance. And so essentially, what the board did in this case was it did the exact same thing that this court did in Depenia. It declined to remand for that reason because they didn't raise that claim to the immigration court in the first instance. Can I take you back to what the IJ actually said about this, the gender-based PSG? So the first thing the IJ says is that it's too amorphous. Yes. It's not clear what it would mean for someone to oppose Trinidad's social norms. In fact, it's unclear what Trinidad's social norms even are. But as your opposing counsel points out, it's very clear what social norms are being opposed in the statement of that PSG. It's the widespread sexual violence against women. I think there's two aspects to that. Can you just address what I just asked you about? Why is it not clear from the framing of the PSG what the social norms are that are being opposed? The social norms, when she defined it, called it abuse, harassment, violence, sexual abuse, and by family members and significant others. And so that's a very wide range of different types of abuse. And there are questions about the extent of harm. Others based on their gender. And the country conditions report are very clear that, yes, women and girls are subject to violence and sexual abuse because of their gender. And that is, in fact, an acceptable social norm. And it's not sufficiently prosecuted. It's a factual question. And they would have to show that the record compels the conclusion that these are, in fact, social norms. And, of course, the argument could be made— You think the record doesn't compel the conclusion that those are social norms? It could be argued. I can understand why there's a great deal of negative country conditions evidence for that. But, again, there's two parts to this PSG. And the first part is the opposition to social norms. And this equates very well to opposition to gang violence or gang harassment or gang recruitment. And so the court in several cases has said, we don't know what that means. We can't define it. Can I just push back on that? Because I don't think they're the same at all. There are a number of groups. It's very well recognized that there are groups of sexual abuse survivors, groups that oppose sexual violence against women that target the fact that there's not enough prosecution of domestic violence within families. So that's very different from groups opposed to gang violence. So, again, if you could just address specifically, why is the evidence in the record not clear on that? Well, at the same time, Ms. Freer is not a part of those groups. But that's not what the IJ said, is it? No, he defined it based on particularity, social distinction, and— He never found she wasn't part of the group. No, but insofar as she was a survivor of domestic violence, she wasn't prior to the abuse began. It was the abuse itself which led to the circularity finding. That's not a question about whether the group is cognizable. The IJ only ruled on whether the group was cognizable, not whether she was part of the group, right? Right. But I would also say that there are two aspects to it. And so, like— What's the other aspect? It was the opposition aspect to it. And so, you have to establish what opposition to this means. And I used the example in a footnote, and I said— But the country conditions reports, they do establish what opposition means. They talk about groups forming to encourage greater investigation and, you know, prosecution of sexual violence, domestic violence within families, don't they? I didn't see it as compelling evidence. Well, is the idea that as the group is defined as just opposing, you can't tell from that formulation what the nature of the opposition it was talking about, whereas maybe the definition that was set forth in the brief to the BIA, which says groups of domestic—survivors of domestic violence might be a different group because in that group we have a sense of what they're doing that's opposing that counts. Right. And there are different groups doing different things. And sort of lump them all together into one big group, I think, would be inappropriate. I think the argument I used or the example I used was the— But even if that's right, by the time we get to the BIA, that is how it's being defined. And the BIA just rejects it nonetheless. The BIA rejected it for the social distinction. And so, the social distinction, in particularity, kind of go hand in hand. But aren't people opposed to domestic violence? Isn't the country conditions report show that is a socially distinctive group? I would argue that it was not socially distinct enough. And so, the example I'm trying to get to is the Mothers Against Drunk Driving. So, you could argue that the general populace generally is opposed to drunk driving. But there is a very specific group that has, you know, particularity, membership, social distinction. And you can say, well, you're a member of that group. And I can understand how that might be a PSG. But, you know, the general populace who is generally opposed to negative things might not necessarily be enough—find enough particularity to say that this is a PSG. So, basically, what you're doing is you have applicants and they work backwards from whatever happened to them and then they define it. And that's where the circularity comes in. And so, that's also—in terms of the exhaustion, Your Honor, raise a good point. Counsel, can I just say? Yes. Just to ask, the Country Condition Report talks about an NGO coalition against domestic violence. I mean, an NGO might not even be Trinidadian women. NGOs are often, you know, from various areas. But this is part of the Trinidad and Tobago Report. I'm looking at—I'm sorry, I don't have the exact page number for you. But I think it's 334. And it's specifically about an NGO coalition against domestic violence charging the police often hesitate to enforce domestic violence laws and assert that rape and sexual abuse against women and children remain a serious and pervasive problem. This is part of the Country Report. You could argue that that NGO, per se, would be a PSG and that would be more persuasive, I think, in the Immigration Court to say that this NGO in particular, it would have problems with immutability. But you could definitely say that this is particular and socially distinct because this is an NGO that you can belong to. As opposed to, you know, this is the NGO on one hand, and on the other hand, you have just generally people who are opposed to these things generally, general populace. And so to suggest that this NGO exists— You just said the mere fact of opposition wouldn't show that you were particularly part of the group or that you would, as the person with that opposition, be socially distinctive in the society. That's right. So yeah, you would have a much better claim if you were part of that NGO and you were persecuted because you were a member of that NGO, as opposed to just generally being opposed to crime, sexual abuse, generally. And so, Your Honor, maybe one last question. Last question. How does that square with Kasinga, though? Because in Kasinga, the very test that distinguished that social group was their opposition to female genital mutilation. Female genital mutilation— And the word was opposition. Right. So how is it square that the BIA thinks opposition is knowable in that context and isn't knowable here? In that context, the parties agreed that the FGM was performed by the specific tribe to overcome sexual characteristics of young women. And I don't think there's that pre-existing sort of moral code that you can say that Trinidadian society sort of exists and is in agreement about the uncle, who is obviously just a criminal sexual deviant, doing these things. Obviously, Trinidad has laws against all these things, as opposed to the tribe in Kasinga, where that was basically expected. That was basically a rule that they had to do this. And so in this instance, you have the opposite. You have all these obvious statutes and rules saying you're not allowed to do these things, and we don't condone it, even though we're not very good at enforcing these laws, obviously. Thank you. And anyway, my time is up. Thank you for having me. Thank you, counsel, at this time. Counsel for the petitioner would reintroduce himself on the record. He has one minute rebuttal. Good morning, Your Honor. Sang-Yup Kim for petitioner. I would just briefly make a point about Judge Barron, Chief Judge Barron and Judge Hill, this question about the waiver before the IJ issue. So I regret I misspoke earlier. In the brief before the IJ, there was no specific argument as to whether the country condition standing alone can satisfy Nexus. However, there was no argument as to there's no point. It was not the petitioner limited his evidence to the testimony alone either. It was just a generalized statement of the law. The point that I'm trying to make is if this court were to deny this case because the specific claim, the angle of the claim was not raised before the IJ, but then BI did not opine on it, but still denied because of that exhaustion problem, there will be so many cases that would face such problems. Because there are so many cases where non-citizens do not even submit the brief before the IJ. What usually happens in practice is they sometimes, depending on the attorneys, depending on the judge's preference, depending on the detention docket, non-detention docket, they submit a general statement, evidence, and then that's it. Sometimes there is no even opportunity for summation either. So what I'm trying to make a point is if there was no argument raised before the IJ and if the BI has a problem with it. Yeah, but you can't have it be the case that you have a, with respect, novel construction of the Nexus argument. Not to say it's wrong, but there's no case of ours that adopts it. Not mention that theory and it's specified in any way. It's naturally read to be making a motive-based argument. The IJ rejects it on motive-based grounds. The BIA affirms citing those exact pages of the IJ's decision on motive-based grounds. And the argument is, well, the BIA was obliged to address this other reconstruction of it rather than just affirming what the IJ did when there was no articulation of it. That's not obvious to me. That would kick out thousands of cases. That would just say kind of regular agency practice. If you want to challenge an administrative appeal what the lower ALJ did, it would be helpful to explain to the ALJ what your theory was. I just want to make one point, Your Honor. Even as I understand Your Honor's concern, but before the IJ, when the petitioner made the legal framework of the Nexus, the petitioner clearly made in page 10 of the brief that to satisfy Nexus, APC only need to show her membership in a particular PSG was one central reason for the persecution. So I think that statement, I understand Your Honor's point. I got it. I see what you're saying. Okay. Unless, of course, any questions, I rest on brief. Thank you. Thank you, counsel. That concludes argument in this case.